# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Bankruptcy Case No. 23-13911 MER |
| EVENT PROMOTION SUPPLY, INC. | Chapter 11 |
| Debtor. | Subchapter V |

## DEBTOR'S AMENDED PLAN OF REORGANIZATION

Dated:  January 24, 2024

Event Promotion Supply, Inc., d/b/a eps-DOUBLET, debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Case"), hereby proposes the following amended plan of reorganization (the "Plan") under sections 1189, 1190 and 1191 of title 11 of the United States Code (the "Bankruptcy Code").

## <u>TABLE OF CONTENTS</u>

ARTICLE 1 DISCLOSURE STATEMENT PURSUANT TO SECTION 1190(1) OF THE CODE ................................................................................................................................ 1

   SECTION A. SUMMARY OF THE PLAN ...................................................................... 1

   SECTION B. BRIEF HISTORY OF THE DEBTOR'S BUSINESS OPERATIONS ............. 3

   SECTION C. LIQUIDATION ANALYSIS OVERVIEW ........................................... 4

   SECTION D. PLAN PROJECTIONS OVERVIEW ................................................. 7

ARTICLE 2 DEFINITIONS AND RULES OF INTERPRETATION ......................................... 8

   SECTION A. DEFINED TERMS .................................................................................. 8

   SECTION B. RULES OF CONSTRUCTION ............................................................. 15

ARTICLE 3 ADMINISTRATIVE EXPENSE CLAIMS AND UNCLASSIFIED PRIORITY CLAIMS ............................................................................................................................. 16

ARTICLE 4 CLASSIFICATION OF CLAIMS ................................................................. 17

ARTICLE 5 TREATMENT OF CLAIMS AND EQUITY INTERESTS .................................... 18

ARTICLE 6 MEANS FOR EXECUTION OF THE PLAN ................................................... 21

ARTICLE 7 IMPLEMENTATION OF THE PLAN .......................................................... 24

ARTICLE 8 VOTING ON THE PLAN ......................................................................... 26

ARTICLE 9 EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................ 27

ARTICLE 10 CONDITIONS PRECEDENT TO EFFECTIVE DATE ................................... 28

ARTICLE 11 RETENTION OF JURISDICTION; CASE CLOSURE; RELEASE AND TERMINATION OF SERVICE OF SUBCHAPTER V TRUSTEE ........................................... 29

ARTICLE 12 MODIFICATION OF THE PLAN .............................................................. 32

ARTICLE 13 STAYS, INJUNCTIONS, EXCULPATIONS, AND RELEASES ...................... 33

ARTICLE 14 DEFAULT AND REMEDIES ................................................................... 34

ARTICLE 15 MISCELLANEOUS ............................................................................... 35

## ARTICLE 1
## DISCLOSURE STATEMENT PURSUANT TO SECTION 1190(1) OF THE CODE

### SECTION A. SUMMARY OF THE PLAN

The following is a brief description and summary of this Plan.[1]

1.1    Under this Plan, the Debtor anticipates paying the Plan Value to the holders of Allowed Secured, Priority, and General Unsecured Claims, with payments made over a period of five years or until the full Plan Value has been paid, if sooner, but in no event will the Plan be shorter than three years unless all creditors are paid in full. This is more than the amount that Allowed Claim holders would receive if the Debtor was to hypothetically liquidate under a Chapter 7 proceeding because, under a Chapter 7 liquidation, the Debtor would be paying Allowed Administrative Claims in addition to all other distributions, which would reduce the amount of funds available to other creditors. Under this Chapter 11 Plan, the Debtor's Parent will pay the Debtor's attorneys' fees and the Parent will subordinate its claims against the Debtor, which will leave more of the Debtor's resources available for payment of creditors. Further, the Plan will allow the Debtor to operate and generate new value to pay its creditors.

1.2    The Debtor shall pay all of its Disposable Income to Secured Claims and Administrative Expense Claims and then to the other Allowed Claim holders on a Quarterly basis— as more fully set forth in Section 1.3 and projected in **Exhibit A**. The Debtor shall continue to make Quarterly Distribution for at least three years and shall continue making Quarterly payments until the Plan Value is met; however, notwithstanding the foregoing, such Quarterly payments shall not exceed five years from the Effective Date.[2] The Plan Distributions will be made by the Distribution Agent, which is anticipated to be the Reorganized Debtor, subject to the terms of section 6.5.1 of the Plan.

1.3    Allowed Claims that are not Secured will be paid in the order of priority established by the Bankruptcy Code.  The Debtor has two primary secured creditors: the SBA and Adams County. Under the Plan, the Debtor is assuming the SBA Loan Agreement and the SBA will be paid in the manner consistent with the terms of the Loan Agreement and all cure amounts will be paid on or before the Effective Date. The Debtor will pay Adams County in full over five (5) years, as required by the Bankruptcy Code.[3] 11 U.S.C. § 1129(a)(9)(C)-(D). There are two remaining secured creditors: Hewlett-Packard and Ally Bank Lease Trust. Hewlett-Packard has filed a UCC-1 on certain of the Debtor's equipment as part of a lease-to-own agreement. Accordingly, the Debtor intends to pay Hewlett-Packard according to the terms of the lease agreement, which payments are scheduled to end on or around April 2024. Ally Bank Lease Trust ("Ally") has also

---

[1] To the extent there are any inconsistencies with the Article 1 Disclosure Statement and the terms of the Plan, the terms of the Plan shall govern. Capitalized terms used in Article 1, not otherwise defined, shall have the meanings ascribed them in Article 2.

[2] However, the payments to the SBA may exceed the five years, as it is being paid in accordance to the terms of the SBA Loan.

[3] Based on the Debtor's review, the secured claim filed by Stenson Tamaddon has no secured basis and the Debtor anticipates objecting to the secured status of this claim. However, in the event that Stenson Tamaddon's claim is allowed as a secured claim in full or in part, the Debtor will pay it in accordance with its allowed priority.

1

filed a Secured Claim. The Debtor believes that it owes Ally approximately $3,162.51 for leasing a 2021 Chevrolet Blazer and intends to pay this amount as soon as Ally allows payment through its account or provides alternative payment instructions.[4]

1.4     With respect to Allowed Claims that are not Secured, Administrative Expenses will be paid first in full, including the fees and expenses of the Subchapter V Trustee and of the Debtor's Professionals that have not been paid by the Parent in accordance with the procedure approved by the Court. Priority Claims will be paid next, and shall be paid in full. Then General Unsecured Claims will be paid. The Subordinated Claims, which include the Parent's Claim of approximately $2.35 mm, will be subordinated to all other Allowed General Unsecured Claims, written off, or converted to capital in the Reorganized Debtor, as may be agreed on between the Debtor and the Parent and Jon Leasia. In any event, the Parent will receive no distribution under the Plan unless all General Unsecured Claims are paid in full.

1.5     Jean-Bernard Doublet will continue to serve as the CEO of the Debtor. Mr. Doublet's salary, and the salaries of any other insiders of the Debtor, shall not be increased more than 10% per year until the Plan is consummated, and shall only be increased if Distributions under the Plan are and can be made.

1.6     Provided that all other applicable requirements of Subchapter V of Chapter 11 of the Bankruptcy Code are met, the Plan may be confirmed even if every class of impaired Claims does not accept the Plan. *See* 11 U.S.C. § 1191(b). However, the Debtor hopes to achieve consensual confirmation under section 1191(a) of the Bankruptcy Code and that holders of Allowed Claims will consent to the proposed treatment under the Plan.

1.7     The Debtor submits that a consensual plan is preferable for at least the following reasons: (a) it will reduce Administrative Expenses, including the fees of the Subchapter V Trustee and the Debtor's Professionals, which should result in an increase in the amounts paid to holders of Allowed Claims; and (b) it should reduce the amount of time required to achieve confirmation of the Plan, thus expediting the date on which Distributions under the Plan will commence. Further, confirmation of the Plan is in all stakeholders' best interest as the Parent is providing additional value by paying the fees of the Debtor's professionals and subordinating its debt, which would not occur in a Chapter 7 case. If the Debtor's Case were to be converted to a Chapter 7 case, as shown by the Liquidation Analysis, holders of Chapter 11 Administrative Expense Claims would receive no distribution along with holders of Allowed Priority and General Unsecured Claims. However, under this Plan, creditors with Allowed Claims will receive distributions over the life of the Plan, which is more than they would receive in a Chapter 7 Liquidation.

---

[4] Ally filed a *Motion for Relief from Stay and Opportunity for a Hearing Concerning a 2021 Chevrolet Blazer Utility 4D 2LT AWD 2.0L I4 Turbo Pursuant to § 362(D)* [Doc. No. 96]. Since the Petition Date, the Debtor has attempted to make the monthly lease payments but its Ally account has been frozen as a result of the bankruptcy filing, which appears to be the result of a prophylactic response by Ally to avoid any potential automatic stay violations. The Debtor has reached out to Ally concerning this but has not received any responses. As soon as the account is unfrozen, the Debtor will pay all due payments.

2

## SECTION B. BRIEF HISTORY OF THE DEBTOR'S BUSINESS OPERATIONS

### *History of the Debtor's Business Operations*

1.8     The Debtor is a large format printing and marketing company headquartered in Denver, Colorado. The Debtor started out as a screen printer and supplier to the ski racing industry, producing racer bibs and sponsor tents.

1.9     The Debtor then expanded its services into cycling and other prominent events, such as the Amgen Tour of California, the World Alpine Ski Championships, the Major League Baseball All-Star Game, and the Olympic Games.

1.10     Over the past decade, the Debtor continued to expand its offerings to meet marketing demands. The Debtor now offers: (i) screen and digital textile printing, (ii) tents, (iii) banners and flags, (iv) custom structure fabrication, (v) graphics and decals, (vi) retail displays, (vii) race and event supplies, (viii) trade show displays and table covers, (ix) pop-up stores, (x) identification credentials, (xi) dye sub printing, (xii) experiential activations, and (xiii) customized shipping containers.

### *History of the Debtor's Bankruptcy Filing*

1.11     Despite the Debtor's success as a small business, near the beginning of 2020, the Debtor quickly fell victim to the global COVID-19 pandemic. The mandatory closures and "shelter-in-place" restrictions imposed due to the pandemic near the beginning of 2020 negatively impacted the Debtor's business, as virtually all events for which the Debtor provided marketing supplies were cancelled for a significant period of time.

1.12     With the pandemic now largely over, the Debtor's business has begun to slowly improve, but it has not returned to the business levels that the Debtor enjoyed pre-pandemic. While the Debtor is optimistic that its business will continue to improve—including some promising contracts that will likely lead to additional revenue—the Debtor is saddled with obligations that it can no longer service.

1.13     One specific example of an obligation that is unsuitable for the Debtor's operations is the Smith Road Warehouse Lease. Before the pandemic, the Debtor was well-suited for this space. However, with the Debtor's lower post-pandemic business levels, the Smith Road Warehouse Lease space was much larger than the Debtor needed and could reasonably afford.

1.14     Accordingly, the Debtor's goal is to avail itself of the protections and flexibility afforded by the bankruptcy process so that it can right-size its operations and reorganize as a leaner and more profitable company.

### *Case Developments and Procedural History*

1.15     On August 30, 2023 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code, opting to proceed under Subsection V.

1.16    On August 31, 2023, the Debtor filed first day motions, including a cash collateral motion and a motion to retain and pay prepetition obligations for its employees. The Court granted both of these motions.

1.17    On August 31, 2023, the Debtor filed a motion to retain Greenberg Traurig, LLP as the Debtor's legal counsel, and on September 25, 2023, the Court approved the employment application. On December 28, 2023, the Court approved Greenberg Traurig's retainer and authorized procedures for interim advance payments of Greenberg Traurig's fees.

1.18    On September 1, 2023, Mark Dennis was appointed the Subchapter V Trustee over the Case.

1.19    The Debtor entered into a new lease on December 19, 2023, with the Court's approval, which rent is significantly less burdensome than the Smith Road Warehouse Lease. [Doc. Nos. 80, 86].

**SECTION C. LIQUIDATION ANALYSIS OVERVIEW**

The following section includes a liquidation analysis as well as a discussion of the "best interests of the creditors test" under section 1129(a)(7) of the Bankruptcy Code.

1.20    One of the requirements of confirming a plan under section 1191 of the Bankruptcy Code is that the plan must satisfy the requirements of section 1129(a)(7) of the Code, which is sometimes referred to as the "best interest of creditors test." Specifically, each impaired class must either (i) accept the Plan, or (ii) receive or retain property under the Plan, as of the Effective Date of the Plan, "that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 [of the Bankruptcy Code] on such date." The Debtor submits that the Plan meets this test.

1.21    Below in Section 1.28 is a Liquidation Analysis. It is an estimate of the total liquidation proceeds or Chapter 7 Liquidation Value that may be available for distribution if the Debtor's assets are liquidated by a Chapter 7 trustee. It compares this amount to an estimate of the total proceeds that would be available under a Chapter 11 proceeding. The Debtor will pay the Plan Value, which is greater than the Chapter 7 Liquidation Value, to the holders of Allowed Claims within three to five years after the Effective Date.

1.22    The Debtor's most valuable asset is its ability to continue operating and generating business. The Debtor has a successful business history of generating revenue from its marketing work—a history that was primarily disrupted by forces out of the Debtor's control. Allowing the Debtor to continue to run its business and generate revenue will be the greatest and most critical asset that the Debtor possesses.

1.23    As of the Effective Date, the Debtor will hold current assets, including bank accounts, accounts receivable, other receivables, inventory, and raw materials with liquidation values of approximately $478,000. Of this amount, $210,000 is the amount held in bank accounts and cash, $218,000 is the amount of accounts receivable that the Debtor estimates is collectable, and $50,000 is the amount of inventory and raw materials. These amounts reflect liquidation values

4

rather than book values, as book amounts are often inflated and much higher than liquidation values.

1.24    As of the Effective Date, the Debtor will also hold fixed assets, including equipment ($175,200), vehicles ($37,000), computers and equipment ($5,000), and furniture ($2,000), with an aggregate liquidation values of approximately $219,200. These amounts reflect liquidation values rather than book values, as book amounts are often inflated and much higher than liquidation values.

1.25    Thus, as of the Effective Date, the Debtor will hold total assets with liquidation values of approximately $697,200.

1.26    As of the date of this Plan, the Debtor has several secured creditors, the main ones who are (i) the SBA, who claims a lien on all of the Debtor's inventory and accounts and (ii) Adams County, which claims a lien on all property located in Adams County.[5] In or around 2020, the Debtor received a Disaster COVID-19 Economic Injury loan from the SBA (the "SBA Loan"), and the SBA loaned the principal amount of $150,000 to the Debtor. In exchange for the SBA Loan, the Debtor gave the SBA a blanket lien, which covers the Debtor's inventory, equipment, account, and general intangibles. Further, Adams County has asserted a tax lien in the approximate amount of $109,739.77 for *ad valorem* business personal property taxes. Hewlett-Packard has Secured Claim for the remaining payments on a printer for approximately $22,479. Ally has a Secured Claim for approximately $3,162.51.

1.27    Under a Chapter 7 proceeding, the SBA would be entitled to recover its claim first, thus reducing the recovery available to unsecured creditors. However, in connection with this Plan, the Debtor is assuming the SBA Loan, retaining the lien on the Debtor's assets and continuing to pay the SBA in the ordinary course of business pursuant to the terms of the SBA Loan. Further, Adams County would similarly be allowed to recover its claim before General Unsecured Creditors, and thus it is receiving a payment in full before any distributions are made to General Unsecured Creditors.

1.28    The following table is a summary and comparison of the Debtor's views regarding the potential cash available for distribution to the holders of the Allowed General Unsecured Claims under this Plan versus in a chapter 7 liquidation:[6]

---

[5] Stenson Tamaddon has also filed a secured claim. However, based on the Debtor's review, Stenson Tamaddon has no secured basis for its claim and the Debtor anticipates objecting to the secured status of this claim. However, in the event that Stenson Tamaddon's claim is allowed as a secured claim in full or in part, the Debtor will pay it in accordance with its allowed priority.

[6] The Debtor has included the amount of scheduled and filed claims that are currently allowed. However, the Debtor expressly reserves the right to object to any claims, in accordance with the Bankruptcy Code and this Plan.

*ACTIVE 692584207v3*

## LIQUIDATION ANALYSIS

| Asset or Source of Cash for Distributions to Creditors | Proposed Chapter 11 Plan | Hypothetical Chapter 7 Liquidation |
|---|---|---|
| Current Assets | $478,000.00 | $478,000.00 |
| Fixed Assets | $219,200.00 | $219,200.00 |
| Other Assets | $0.00 | $0.00 |
| *Total Anticipated Proceeds Available for Distribution* | *See **Exhibit A*** | *$697,200.00* |
| Less Payments to Holders of Allowed Secured Claims on Account of Liens | ($285,216.69) | ($285,216.69)[7] |
| Less Estimated Payment of Allowed Ch. 7 Administrative Claims | $0.00 | ($86,500.00)[8] |
| Less Estimated Payment of Allowed Ch. 11 Administrative Claims | ($575,414.70)[9] | ($757,414.70)[10] |
| Less Payments to Holders of Priority Claims | ($3,391.65) | ($3,391.65) |
| *Total Available for Distribution to General Unsecured Creditors* | *See **Exhibit A*** | *($435,323.04)* |
| Total General Unsecured Claims | $3,943,369.81 | $3,943,369.81 |
| Less subordination of Parent's claim | ($2,348,576.06) | n/a |
| Less subordination of Leasia's claim | ($464,947.00) | n/a |
| ***Estimated % Distribution to General Unsecured Creditors*** | ***10.0%*** | ***0.0%*** |

---

[7] This includes (i) the SBA for $160,844.11; (ii) Adams County for $109,739.77; (iii) Ally for $2,955.62; and (iv) Stenson Tamaddon for $11,677.19. The Debtor reserves all rights to object to any asserted Secured Claims.

[8] This amount includes an estimated Trustee commission of $36,500 and the Trustee's attorney fees for $50,000.

[9] This is an estimate of the rent payable to the former landlord of the Smith Warehouse property ($302,616.82), as well as other accounts payable that have accrued post-petition ($272,797.88). The Debtor reserves all rights to object to any asserted Administrative Claims. Greenberg's legal fees are not included in this as the Parent has agreed to cover the Debtor's legal fees if a Plan is confirmed.

[10] This amount includes Greenberg's legal fees in an estimated amount of $200,000. Note that all fees are subject to Court approval.

*ACTIVE 692584207v3*

1.29    Four creditors filed Secured Claims totaling $285,216.69. A summary of these Claims is included below.[11]

| Creditor | Claim Amount | Secured Collateral[12] |
|---|---|---|
| Adams County Treasurer | $109,739.77 | Equipment, etc. |
| Ally Bank | $2,955.62 | 2021 Chevrolet Blazer |
| SBA | $160,844.11 | Blanket lien |
| Stenson Tamaddon[13] | $11,677.19 | Debtor's assets and accounts receivable up to fee amount |
| **TOTAL** | **$285,216.69** | |

1.30    If the Plan is confirmed, the Debtor anticipates Administrative Claims totaling $575,414.70. This sum is based on a claim for approximately $302,616.82 by LIT Industrial Limited Partnership, the Debtor's former landlord, associated with lease obligations that accrued during the pendency of this Case prior to the Debtor's rejection of the lease. As stated in footnote 9 *supra*, the Debtor reserves the right to object to all claims asserted by the landlord. Under this Chapter 11 proceeding, the fees of the Debtor's bankruptcy counsel, Greenberg Traurig, are being paid by the Debtor's Parent, and thus, are not included in the Chapter 11 sum Administrative Claim sum above. However, if the Debtor were to liquidate under Chapter 7, Greenberg Traurig's fees, along with a Chapter 7 trustee's fees, would both be paid out of the Debtor's liquidation value. Thus, this increases the projected Administrative Claim value under a Chapter 7 liquidation by $200,000.00.

1.31    In summary, potential recovery by creditors in Chapter 11 are far better than such creditors would receive in a Chapter 7 liquidation. Further, it is highly probable—if not certain—that creditor recoveries would be less in Chapter 7 than they would be through the Plan.

**SECTION D. PLAN PROJECTIONS OVERVIEW**

1.32    Another requirement of confirming a plan under section 1191 of the Bankruptcy Code is that the plan must satisfy the requirements of 1129(a)(11) of the Code, which is sometimes referred to as "feasibility." Specifically, the Debtor must show that confirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization of the

---

[11] Certain secured claims are not listed in this chart because the Debtor believes they are no longer secured and/or are objectionable; thus, the Debtor plans to object to such claims.

[12] These descriptions are pulled from the Proof of Claims submitted by the various secured creditors. By listing these descriptions, the Debtor does not admit the validity of any such claims, nor does the Debtor waive the right to object to any such secured claims.

[13] As stated above, the Debtor plans to object to this claim.

7

Debtor or any successor to the debtor under the plan unless such liquidation or reorganization is proposed in the plan.

      1.33    The Debtor's projected Disposable Income is shown on **Exhibit A**, attached hereto. The projections anticipate that the Debtor will be able to fund its projected Disposable Income through its ongoing business operations and pay Administrative Expenses in full and pay holders of Allowed Secured, Priority, and General Unsecured Claims the Plan Value, which is more than such claims holders would receive in a Chapter 7 liquidation proceeding. The Debtor submits that the Plan is not likely to be followed by the liquidation or need for future reorganization of the Debtor.

**ARTICLE 2**
**DEFINITIONS AND RULES OF INTERPRETATION**

**SECTION A. DEFINED TERMS**

      For purposes of this Plan, the following terms shall have the meanings specified in this Article 2.  A term used but not defined herein, which is also used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.

      2.1    "Administrative Expense Claim" shall mean a Claim that is Allowed under section 503(b) of the Bankruptcy Code and that is entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without limitation, fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, fees and expenses of the Subchapter V Trustee Allowed pursuant to an Order of the Bankruptcy Court, and all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

      2.2    "Allowed" shall mean, with reference to any Claim:

      2.2.1   a Claim that has been listed by the Debtor in its Schedules and (i) is not listed as disputed, contingent or unliquidated, (ii) is not a Claim as to which a proof of claim has been filed, and (iii) is not a Claim as to which the Debtor has filed an objection;

      2.2.2   a Claim as to which a timely proof of claim has been filed by the Bar Date in a sum certain and (i) is not a Contingent or Unliquidated Claim, and (ii) either (a) no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been made on or before any applicable deadline, or (b) if an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery has been interposed, the extent to which such Claim has been allowed (whether in whole or in part) by a Final Order;

      2.2.3   a Claim arising from the recovery of property under section 550 or 553 of the Bankruptcy Code and allowed in accordance with section 502(h) of the Bankruptcy Code;

      2.2.4   any Claim expressly allowed under this Plan or pursuant to the Confirmation Order; or

8

2.2.5    any Claim expressly allowed pursuant to a Final Order of the Bankruptcy Court.

2.3    "<u>Applicable Rate</u>" means an annual rate of interest equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the federal Reserve System, for the calendar week immediately preceding the Confirmation Date.

2.4    "<u>Avoidance Actions</u>" shall mean Causes of Action arising or held by the Estate under sections 502, 510, 541, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws.

2.5    "<u>Bankruptcy Case</u>" and "<u>Case</u>" shall mean the Debtor's Subchapter V chapter 11 bankruptcy case pending in the Bankruptcy Court under case number 23-13911-MER.

2.6    "<u>Bankruptcy Code</u>" and "<u>Code</u>" shall mean title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Case.

2.7    "<u>Bankruptcy Court</u>" and "<u>Court</u>" shall mean the United States Bankruptcy Court for the District of Colorado in which the Bankruptcy Case is pending and, to the extent of any reference under 28 U.S.C. § 157, the unit of such District Court specified pursuant to 28 U.S.C. § 151.

2.8    "<u>Bankruptcy Rules</u>" and "<u>Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

2.9    "<u>Bar Date</u>" shall mean:  (i) November 8, 2023 with respect to a Claim against the Estate other than a Claim of a Governmental Unit; (ii) February 26, 2023 with respect to a Claim of a Governmental Unit against the Estate; (iii) if applicable, any special deadline for certain creditors to file proofs of claim as specified by the Court; or (iv) if this Plan and/or an order of the Court establishes a different bar date for a specific claim or category of claims (*e.g.*, rejection damages claims), the date established by the Plan or order of the Court.

2.10    "<u>Business Day</u>" shall mean any day other than a Saturday, Sunday, or legal holiday recognized in the State of Colorado.

2.11    "<u>Cash</u>" shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

2.12    "<u>Causes of Action</u>" shall mean, without limitation, any and all actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise, including, without limitation, Avoidance Actions.

2.13    "<u>Chapter 7 Liquidation Value</u>" shall mean an amount equal to the value available for Distribution to Allowed Claims if the Debtor were to hypothetically liquidate through a Chapter

9

7 trustee under a Chapter 7 proceeding rather than reorganize, as represented in the Liquidation Analysis in Section 1.28 above.

2.14    "Claim" shall mean a claim against a Person or its property as defined in section 101(5) of the Bankruptcy Code, including, without limitation, (i) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

2.15    "Class" shall mean those classes designated in Article IV of this Plan.

2.16    "Collateral" shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

2.17    "Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Bankruptcy Case.

2.18    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

2.19    "Contingent or Unliquidated Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court on or before the applicable Bar Date, but which: (a) was not filed in a sum certain; or (b) is contingent upon any event or condition which has not occurred and/or is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed by a Final Order.

2.20    "Debtor" shall mean Event Promotion Supply, d/b/a eps-DOUBLET.  References to the Debtor shall mean and refer to the Reorganized Debtor at any point in time after the Effective Date.

2.21    "Default Notice" shall have the meaning assigned in section 14.1.

2.22    "Disallowed" shall mean and refer to any Claim that does not fall within the definition of "Allowed."

2.23    "Disclosure Statement" shall mean information required by section 1190(1) of the Code and which is included in this Plan under Article 1, above.

2.24    "Disposable Income" shall mean New Net Profit received by the Debtor that is not reasonably necessary to be expended for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtor, but only to the extent that the Debtor continues to operate its business. For the avoidance of doubt, the payments to be made to the SBA pursuant to the SBA Loan Agreement is a necessary payment for the Debtor's business

10

operations and such payments shall reduce the Disposable Income proportionally. Further, given the cyclical and seasonal nature of the Debtor's business, the Debtor requires at least a $200,000 cash reserve to meet operating expenses in certain slower quarters. The Debtor may, in its sole discretion, drop below this $200,000 cash reserve to accelerate payments to creditors. However, Disposable Income shall not include the necessary cash reserve for the Debtor's operations nor shall the Debtor be compelled to make Distributions if the cash reserve dips below $200,000.

2.25 "<u>Disputed Claim</u>" shall mean:

2.25.1 if no proof of claim relating to a Claim has been filed, a Claim that is listed in the Schedules as unliquidated, disputed or contingent; or

2.25.2 a Claim as to which an objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by the Debtor in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order; or

2.25.3 a Claim that otherwise is "Allowed," but which is a Contingent or Unliquidated Claim.

2.26 "<u>Disputed Claim Amount</u>" shall mean the amount set forth in the proof of claim relating to a Disputed Claim or an amount estimated pursuant to an order of the Bankruptcy Court in respect of a Disputed Claim in accordance with section 502(c) of the Bankruptcy Code.

2.27 "<u>Disputed Lien</u>" shall mean a Lien which is the subject of a pending Avoidance Action or any other type of judicial challenge to the validity, priority or enforceability of the Lien, whether prosecuted by the Debtor or another party-in-interest and whether filed in the Bankruptcy Court or another court of competent jurisdiction. Independent of and in addition to the foregoing, if the Claim secured by a Lien is a Disputed Claim, the Lien shall be considered a Disputed Lien unless and until the Claim is Allowed.

2.28 "<u>Distribution</u>" shall mean a payment of available Disposable Income to holders of Allowed Claims by the Distribution Agent on the Distribution Date, paid according to the priority order set forth in section 6.6 of this Plan.

2.29 "<u>Distribution Agent</u>" shall have the meaning specified in section 6.5.1 of this Plan. In short, the Reorganized Debtor shall be, and serve as, the Distribution Agent.

2.30 "<u>Distribution Date</u>" shall mean thirty (30) days after the last day of each full Quarter following the Effective Date, up to and including the Final Distribution Date, or if the thirtieth day following the last day of any Quarter is not a Business Day, the first Business Day immediately thereafter.

2.31 "<u>Distribution Account</u>" shall have the meanings provided under section 6.5.2 of this Plan.

2.32     "Effective Date" shall mean the later of (a) the first Business Day on which the Confirmation Order is no longer subject to a stay pursuant to Federal Rule of Bankruptcy Procedure 3020(e) or otherwise, and (b) unless such thirty day period is waived by the Debtor as permitted under section 10.1 of the Plan, the first Business Day that is at least thirty calendar days after the Confirmation Date; provided, however, that if, as of such date, all conditions precedent to the occurrence of the Effective Date set forth in section 10.1 of the Plan have not been satisfied or waived, then the Effective Date shall be the first Business Day immediately following the day upon which all such conditions have been satisfied or waived.

2.33     "Employee Obligation Order" shall mean the Court's Order Granting Debtor's Motion for Entry of an Order Authorizing the Debtor to Pay (A) All Prepetition Employee Obligations and (B) Prepetition Withholding Obligations and Dues [Doc. No. 27].

2.34     "Equity Interest" shall mean any member interest in the Debtor, and all options, warrants and rights, contractual or otherwise, to acquire any such member interests, as such interests exist immediately prior to the Effective Date.

2.35     "Estate" shall mean the estate created in the Bankruptcy Case pursuant to sections 541 and 1186 of the Bankruptcy Code.

2.36     "Final Distribution Date" shall mean the earlier of (a) the Distribution Date immediately prior to, or substantially contemporaneous with, the filing of notice of substantial consummation pursuant to section 1183(c)(2) of the Bankruptcy Code, or (b) the twentieth Quarterly Distribution Date, whichever is earlier; provided, however, that the Final Distribution Date will be the date of the last payment/Distribution under this Plan.

2.37     "Final Order" shall mean an order, decree, or judgment that is not subject to a stay pursuant to Federal Rule of Bankruptcy Procedure 3020(e), a stay applicable by order of the Bankruptcy Court, or by order of another Court with jurisdiction to stay an order entered in this Case, or otherwise.  If an order is not subject to a stay, the possibility that it may be modified, amended or reversed upon appeal, pursuant to a motion under Federal Rules of Civil Procedure 59 or 60, or otherwise shall not hinder the finality of a Final Order.

2.38     "General Unsecured Claim" shall mean a Claim that is not a Secured Claim or that is not entitled to priority of payment under section 507 of the Bankruptcy Code.

2.39     "In Full," when used to describe a payment to a creditor, shall mean that the creditor will be paid the full amount of the creditor's claim as of the Petition Date.

2.40     "Initial Distribution Date" shall mean and refer to the Distribution Date first occurring after the Effective Date.

2.41     "Interim Distribution Date" shall mean each Distribution Date other than the Final Distribution Date.

2.42     "IRS" shall mean the United States Department of Treasury – Internal Revenue Service.

12

2.43    "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code; except that a Lien that has been avoided in accordance with sections 544, 545, 546, 547, 548, 549, or 553 of the Bankruptcy Code shall not constitute a Lien.

2.44    "Owner" means and refers to the holder of an Equity Interest.

2.45    "New Net Profit" means the net profits obtained by the Debtor from the sales of newly created products and marketing, calculated by determining gross sales income less cost of goods sold.

2.46    "Parent" shall mean Doublet, S.A., the parent company of the Debtor.

2.47    "Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, Governmental Unit or political subdivision thereof.

2.48    "Petition Date" shall mean August 30, 2023.

2.49    "Plan" shall mean this Plan of Reorganization, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time.

2.50    "Plan Period" shall mean the period of time commencing on the Effective Date and ending on the Final Distribution Date. If the treatment of a particular Claim or creditor relates to periods of time preceding the Effective Date (including payments made or received between the Petition Date and the Effective Date), then the Plan Period shall commence on the Petition Date with respect to that particular Claim or creditor.

2.51    "Plan Value" shall mean a total distribution amount that pays In Full all Secured, Administrative, and Priority Claims, and then pays General Unsecured Claims a pro rata distribution of $112,985.68 that will be funded with the Debtor's Disposable Income and paid to Creditors over the life of the Plan in the order of priority set forth in section 6.6 below.

2.52    "Priority Claims" shall mean any and all Claims (or portions thereof), if any, entitled to priority under section 507(a) of the Bankruptcy Code other than Administrative Expense Claims. If a Claim otherwise entitled to priority is a Secured Claim, it shall not be deemed to be, or treated as, a Priority Claim.

2.53    "Priority Tax Claims" shall mean any Claim of a Governmental Unit entitled to priority under section 507(a)(8) of the Bankruptcy Code, and that is not a Secured Claim.

2.54    "Pro Rata" shall mean a proportionate share of the total distribution made at any particular time under this Plan to the holders of Allowed Claims in a Class, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the total of all Allowed Claims in such Class.

*ACTIVE 692584207v3*

2.55    "Professionals" shall mean (i) those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or (ii) those Persons for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

2.56    "Quarter" means and refers to the calendar quarters ending, respectively, on March 31, June 30, September 30, and December 31.

2.57    "Quarterly" means on the basis of a Quarter.

2.58    "Reaffirmation Agreement" means that certain agreement, which shall be entered into between the Debtor and the SBA, reaffirming the Debtor's prepetition loan agreement with the SBA and providing the SBA with a lien in the same priority position that the SBA occupied prepetition.

2.59    "Reorganized Debtor" shall mean the Debtor, as reorganized after the Effective Date pursuant to the terms of this Plan.

2.60    "SBA" shall mean the United States Small Business Administration.

2.61    "SBA Loan" shall mean that certain Disaster COVID-19 Economic Injury loan entered between the Debtor and the SBA.

2.62    "Schedules" shall mean the schedules of assets and liabilities, the list of holders of interests and the statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists, and statements have been or may be supplemented or amended from time to time.

2.63    "Secured Claim" shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is a claim of setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

2.64    "Smith Road Warehouse Lease" means the Debtor's prepetition lease for warehouse and headquarter operations at 12900 Smith Road, Aurora, CO 80011.

2.65    "Subchapter V Trustee" and "Trustee" mean and refer to the trustee appointed in this Case pursuant to section 1183 of the Bankruptcy Code.

2.66    "Subordinated Claim" shall mean any Claim (i) that is or becomes subordinated pursuant to section 510 of the Bankruptcy Code, (ii) a type specified in section 726(a)(3)-(4) of the Bankruptcy Code, (iii) held by the Parent, of (iv) held by Jon Leasia.

2.67    "Total Distributions" shall have the meaning provided under section 6.5.4 of this Plan.

2.68    "Unclassified Priority Claims" are Priority Claims (other than Administrative Expense Claims) defined in section 3.3 of this Plan, including claims within the scope of sections 507(a)(2), 507(a)(3), and/or 507(a)(8) of the Bankruptcy Code.

2.69    "United States Trustee" and "UST" mean and refer to the United States Trustee and its attorneys and agents.

## SECTION B. RULES OF CONSTRUCTION

2.70    **Capitalized Terms**.  Unless otherwise provided, any capitalized terms used in the Plan shall have the meaning set forth in this Article 2.

2.71    **Other Terms**.  All terms not defined in this Article 2 or otherwise defined in the Plan, but that are defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed by the Bankruptcy Code or the Bankruptcy Rules.  For convenience, terms defined in the Bankruptcy Code may be capitalized in the Plan, and the Plan sometimes may include a cross-reference to the Bankruptcy Code.  Neither the failure to capitalize any such term, nor the failure to include a Bankruptcy Code cross-reference, however, shall modify the meaning or use of such term as defined in the Bankruptcy Code.

2.72    **References Generally**.  All references to an "article" or "articles" are to articles in the Plan, including all sections, subsections, and numbered paragraphs under the referenced article. References to a "section" or "sections" are to the section of this Plan or, if applicable, a section of the Bankruptcy Code.  All references to a "section," "paragraph," "sections" or "paragraphs" designated by numbers are to the individual numbered sections or numbered paragraphs in the Plan or Code, as applicable, including all subsections and subparagraphs.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, sub-section or clause contained in the Plan.

2.73    **References to Documents, Headings or Exhibits**.  Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions shall mean that such document shall be substantially in such form or substantially on such terms and conditions.  Any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented.  Unless otherwise specified in a particular reference, all references in the Plan to articles, sections, subsections and exhibits are references to articles, sections, subsections and exhibits of or to the Plan.

2.74    **General Rules of Construction**.  The headings at the beginning of each paragraph or section this Plan are solely for convenience and may not be used or construed in any manner to interpret, define, change, modify, amend, alter or restrict the substance of the Plan.  Unless the context requires otherwise, singular nouns and pronouns used in this Plan shall be deemed to include the plural, and pronouns of one gender or the neuter shall be deemed to include the equivalent pronouns of the other gender or the neuter.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the terms of this Plan.

2.75    **Computation of Time**.  In computing any period of time prescribed or allowed in the Plan, Bankruptcy Rule 9006(a) shall apply.

*ACTIVE 692584207v3*

**ARTICLE 3**
**ADMINISTRATIVE EXPENSE CLAIMS AND UNCLASSIFIED PRIORITY CLAIMS**

3.1    **Non-Classification**. As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Unclassified Priority Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan. All such Claims instead are treated separately in accordance with the terms in this Article 3.

3.2    **Administrative Expense Claims.**

3.2.1   Bar Date. All applications for allowance of Administrative Expense Claims other than (a) fees and expenses of Professionals Allowed pursuant to an Order of the Bankruptcy Court, and (b) fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930, shall be filed not later than thirty (30) days after the Effective Date. All Administrative Expense Claims not filed within thirty days after the Effective Date shall be barred. The deadline in the preceding sentence shall be construed and have the same force and effect as a statute of limitations. The Reorganized Debtor shall provide notice of this deadline to all creditors listed on the mailing matrix of this bar date within ten days after the Effective Date. The Bankruptcy Court shall determine all Administrative Expense Claims.

3.2.2   General. As of the date of this Plan, the Debtor anticipates having an Administrative Claim in an amount of $302,616.82 asserted by LIT Industrial Limited Partnership for post-petition lease obligations. Except as otherwise agreed to by the Debtor and the holder of an Allowed Administrative Expense Claim, and subject to section 3.2.4 below, each such holder shall be paid in full in Cash. All Allowed Administrative Expenses Claims shall be paid in full over the life of the Plan.[14] If the Debtor disputes any portion of an Administrative Expense Claim, the Debtor shall set the funds aside into the Disputed Claim Reserve.

3.2.3   U.S. Trustee's Fees. Because this is a case under Subchapter V of Chapter 11, the Debtor is not required to pay fees to the United States Trustee pursuant to 28 U.S.C. § 1930.

3.2.4   Professional Compensation and Expense Reimbursement Claims.

3.2.4.1 The Subchapter V Trustee and each Professional shall file a final application for the allowance of fees, compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date within thirty (30) days after the Effective Date. Any award granted by the Bankruptcy Court shall be paid by either the Parent or the Debtor (i) within fifteen days of the entry of the order of the Bankruptcy Court approving such award, unless a stay is obtained, or (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Expense Claim and the Debtor.

---

[14] If any Administrative Expense Claimant object to these payment terms, the Debtor will seek to approve the Plan under the cramdown provisions set forth in the Bankruptcy Code.

16

Once approved by the Court, the Subchapter V Trustee and each Professional shall be permitted to apply any approved retainer being held.

3.2.4.2 All fees and expenses of the Subchapter V Trustee or Professionals for services rendered after the Effective Date in connection with the Bankruptcy Case and the Plan shall be paid by the Debtor, or the Parent, upon receipt of reasonably detailed invoices therefor in such amounts and on such terms as such Subchapter V Trustee or Professional, on the one hand, and the Debtor, on the other hand, may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

3.3    **Unclassified Priority Claims**.  Allowed Priority Tax Claims shall be paid in Cash after the Effective Date over the Plan Period, in compliance with section 1129(a)(9)(C) of the Bankruptcy Code. Allowed Priority Tax Claims will not be paid until Allowed Administrative Expense Claims are paid in full.[15]

# ARTICLE 4
# CLASSIFICATION OF CLAIMS

4.1    **Claims Provided for in the Plan**.  This Plan treats all Claims against the Debtor, against the Debtor's Property, and against the Estate. Only Allowed Claims receive any Distribution under this Plan. All other Claims are disallowed by the Plan and will not receive any Distributions under the Plan.

4.2    **Limitation on Inclusion in a Class**.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that class. A Claim is in a particular Class only to the extent that the portion of the Claim is an Allowed Claim in that class.

4.3    **Unclassified Claims**.  In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims are not classified under this Article 4, but are treated in the Plan in accordance with the requirements of 11 U.S.C. § 1129.  Likewise, in accordance with § 1123(a)(1) of the Bankruptcy Code, gap claims within the scope of section 507(a)(3) of the Bankruptcy Code and tax claims within the scope of section 507(a)(8) of the Bankruptcy Code are not classified except to the extent such claim otherwise should be classified (*e.g.*, in the event such claims are not unsecured Priority Claims but are Secured Claims).

4.4    **Classified Claims and Interests**.   Claims, other than Administrative Expense Claims and Unclassified Priority Claims, shall be classified for all purposes, including voting on, confirmation of, and distribution pursuant to the Plan, as follows:

4.4.1   Class 1 – Priority Claims.  Class 1 shall consist of all Allowed Priority Claims against the Debtor other than (a) Unclassified Priority Claims (including Priority Tax Claims), and (b) Priority Claims that are Secured Claims.

---

[15] The Debtor anticipates filing and succeeding in several claim objections, including objections against priority tax claimants. The Debtor has accounted for these objections in its projections. However, to the extent that such objections are not successful, the Debtor will pay priority tax claimants in accordance with this section.

4.4.2   <u>Class 2 – General Unsecured Claims</u>.  Class 2 shall consist of all Allowed General Unsecured Claims against the Debtor.

4.4.3   <u>Class 3 – SBA's Secured Claim</u>.  Class 3 shall consist of the Allowed Secured Claim of SBA.

4.4.4   <u>Class 4 – Miscellaneous Secured Claims</u>.  Class 4 shall consist of all Allowed Claims that are secured by property of the Debtor that are not otherwise classified under this Plan.

4.4.5   <u>Class 5 – Subordinated Claims</u>.  Class 5 shall consist of the Allowed Subordinated Claims.

4.4.6   <u>Class 6 – Equity Interests in the Debtor</u>.  Class 6 shall consist of all Equity Interests in the Debtor.

## ARTICLE 5
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

5.1   **Class 1 – Priority Claims.**

5.1.1   <u>Impairment and Voting</u>.  Class 1 is impaired under the Plan. Each holder of an Allowed Class 1 Claim shall be entitled to vote to accept or reject the Plan.

5.1.2   <u>Payment</u>.  The holders of Allowed Class 1 Claims shall be paid the full amount of their claim as of the Petition Date, plus interest from and after the Effective Date at the Applicable Rate.

5.1.3   <u>Distributions</u>.  Subject to the limitations and priorities described in section 6.6, the holders of Allowed Class 1 Claims shall be paid, pro rata, (i) from time to time, but in any event at least on the Initial Distribution Date and the subsequent Interim Distribution Dates, to the extent that the Debtor has available Disposable Income available on such dates, and (ii) on the Final Distribution Date.

5.1.4   <u>Priority Claims Already Paid</u>.  To the extent that an Allowed Class 1 Claim was paid pursuant to the Employee Obligation Order, such Claim shall be deemed paid in full and shall not be entitled to the payments or Distributions set forth in sections 5.1.2 and 5.1.3 above.

5.2   **Class 2 – General Unsecured Claims.**

5.2.1   <u>Impairment and Voting</u>.  Class 2 is impaired under the Plan.  Each holder of an Allowed Class 2 Claim shall be entitled to vote to accept or reject the Plan.

5.2.2   <u>Payment</u>.  The holders of the Allowed Class 2 Claims shall be paid the greater of: (i) their pro rata share of the Debtor's Disposable Income, according to priority, over three years; (ii) their pro rata share of the Plan Value over three to five years. Either

18

treatment is more than holders of Allowed Class 2 Claims would have received under a Chapter 7 liquidation proceeding.

5.2.3    <u>Distributions</u>.  Subject to the limitations and priorities described in section 6.6, the holders of Allowed Class 2 Claims shall be paid, pro rata, (i) from time to time, but in any event at least on the Initial Distribution Date and the subsequent Interim Distribution Dates, to the extent that the Debtor has Disposable Income available on such dates, and (ii) on the Final Distribution Date.  The funds in the Distribution Account will be paid, first, to the holders of Allowed Claims having greater priority in distribution. Specifically, the holders of Allowed Class 2 Claims will not receive distributions until the holders of claims with higher priority listed under section 6.6 of the Plan have been paid or reserved in full.

5.3    <u>**Class 3 – SBA's Secured Claim.**</u>

5.3.1    <u>Impairment and Voting</u>.  Class 3 is unimpaired under the Plan.  Each holder of an Allowed Class 3 Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.3.2    <u>Payment</u>.  In accordance with the terms of the SBA Loan, the SBA shall be paid in the ordinary course of business the full amount that is owed. For the avoidance of doubt, the Debtor will make monthly interest payments to the SBA, as provided in the SBA Loan, and will pay the remaining principal balance on the SBA Loan maturity date.

5.3.3    <u>Retain Lien</u>.  The SBA shall retain its Lien on all post-petition inventory, accounts receivable, and income derived from the operation of the Debtor's inventory and accounts until its Allowed Secured Claim is paid in full.  This Lien shall maintain the same priority to assets as did SBA's prepetition lien.

5.4    <u>**Class 4 – Miscellaneous Secured Claims.**</u>

5.4.1    <u>Impairment and Voting</u>.  Class 4 is impaired under the Plan. Each holder of an Allowed Class 4 Claim shall be entitled to vote to accept or reject the Plan. The members of this class include the Adams County Treasurer, Ally Bank, and Stenson Tamaddon. The amounts of these claims and the secured collateral associated with each claim is set forth in section 1.8 above.[16]

5.4.2    <u>Distributions</u>.  Except to the extent that the holder of an Allowed Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement and release of each Allowed Secured Claim, each holder of an Allowed Secured Claim  shall be paid in full over the life of the Plan.

---

[16] The Debtor explicitly reserves the right to object to any Class 4 Claims, and by listing such claims, the Debtor in no way admits their validity or waives any objection rights.

5.4.3    Abandonment.  At the discretion of the Reorganized Debtor, any Collateral securing a Class 4 Claim may be abandoned to the holder of the Class 4 Claim secured by such Collateral, in full satisfaction of the Allowed Secured Claim.

5.5    **Class 5 – Subordinated Claims**

5.5.1    Impairment and Voting.  Class 5 is impaired under the Plan. Each holder of an Allowed Class 5 Claim shall be entitled to vote to accept or reject the Plan.

5.5.2    Payment.  The holders of the Allowed Class 5 Claims shall be paid a *pro rata* distribution, if there are funds remaining.

5.5.3    Distributions.  Subject to the limitations and priorities described in section 6.6, the holders of Allowed Class 5 Claims shall be paid, pro rata, (i) from time to time, but in any event at least on the Initial Distribution Date and the subsequent Interim Distribution Dates, to the extent that the Debtor has Disposable Income available on such dates, and (ii) on the Final Distribution Date. The funds in the Distribution Account will be paid, first, to the holders of Allowed Claims having greater priority in distribution. Specifically, the holders of Allowed Class 5 Claims will not receive distributions until the holders of claims with higher priority listed under section 6.6 of the Plan have been paid or reserved in full.

5.6    **Class 6 – Equity Interests in the Debtor.**

5.6.1    Impairment and Voting.  Class 6 is unimpaired under the Plan.  Each holder of an Equity Interest in the Debtor is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.6.2    Retention of Interest.  Each record holder of an Equity Interest in the Debtor shall retain its interest in the Debtor. Subject to the limitations and priorities described in section 6.6, it is anticipated that the holders of Allowed Class 6 Interests shall receive no pro rata distributions on or before the Final Distribution Date.

5.7    **Satisfaction of Claims and Release.  As of the Effective Date, all Claims against the Debtor, the Estate, or the Debtor's or the Estate's property shall be released except as provided in the Plan.**

5.8    **No Assumed Liability**.  Except as otherwise expressly set forth in the Plan, the Reorganized Debtor shall not assume or be liable for any Claims.

5.9    **Disputed Claims**.  Notwithstanding any other provision of this Plan, no Cash or property shall be distributed under the Plan on account of any Disputed Claim until the Claim is Allowed. The Distribution Agent shall establish a reserve ("Disputed Claims Reserve") with respect to Disputed Claims. Cash and property to be distributed on account of Disputed Claims shall be held by the Distribution Agent until such Claims are Allowed or disallowed by Final Order.  At the option of the Distribution Agent, Cash which is held in Disputed Claim Reserve may be held in the Distribution Account, may be deposited into one or more segregated, interest-bearing bank accounts that satisfy the requirements of 11 U.S.C. § 345, or may be used to purchase

20

a short-term certificate of deposit or another short-term investment. Upon the later of the Effective Date or thirty (30) days after a Disputed Claim becomes Allowed, the holder shall receive a distribution from the Disputed Claims Reserve, based upon the Allowed amount of the Claim and, thereafter, shall participate in any further distributions under the Plan as the holder of an Allowed Claim. Any cash or property remaining in the Disputed Claims Reserve after the resolution of all disputes by Final Order shall be distributed in accordance with the Plan.

5.10   **No Penalties**. Except as expressly stated in the Plan or allowed by the Bankruptcy Court, no late charge or penalty, including but not limited to prepayment penalties, shall be allowed on any Claim subsequent to the Petition Date.

5.11   **All Defaults Cured and Waived; All Notes and Obligations Decelerated and Reinstated**. Pursuant to sections 1123(a)(5)(G) and 1124(2) of the Bankruptcy Code, among others, and except as otherwise provided by this Plan, all defaults that existed or that may have existed under any promissory note, loan document, unexpired lease, executory contract or other written agreement of or by the Debtor shall be deemed cured and waived as of the Effective Date. All notes, instruments or obligations that were accelerated pre-petition and/or pre-confirmation shall be decelerated and reinstated as of the Effective Date. All judicial and nonjudicial foreclosure actions and proceedings that were instituted pre-petition and/or preconfirmation shall be canceled, terminated and/or deemed withdrawn and rescinded as of the Effective Date.

## ARTICLE 6
## MEANS FOR EXECUTION OF THE PLAN

6.1   **Vesting of Property**. Except as otherwise provided in this Plan, the Reorganized Debtor, as of the Effective Date, shall be vested with all of the assets of the Estate.

6.2   **Avoidance Actions and Other Claims**. Without limiting the foregoing, the Reorganized Debtor shall be vested with all claims and causes of action of the Debtor including, without limitation, Avoidance Actions and other claims arising under sections 510, 541, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

6.3   **Bankruptcy Case Administration**. Except as otherwise provided in this Plan, from and after the Effective Date and continuing through the date on which a Final Order closing the Bankruptcy Case is entered pursuant to section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Reorganized Debtor and the Distribution Agent shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Bankruptcy Case. In addition to the foregoing, for all matters arising under or related to the Bankruptcy Case, the Reorganized Debtor and the Distribution Agent shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction, (ii) be entitled to notice and opportunity for hearing, (iii) participate in all matters brought before the Bankruptcy Court, including but not limited to adversary proceedings, and (iv) receive notice of all applications, motions and other papers and pleadings before the Bankruptcy Court.

6.4   **Continuation of Business Operations**. From and after the Effective Date of the Plan, the Reorganized Debtor is authorized to continue its normal business operations and enter

into such transactions as it deems advisable, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan. Jean-Bernard Doublet will continue to serve as the CEO of the Debtor. Salaries of insiders of the Debtor shall not be increased more than 10% per year until the Plan is consummated, and such increases shall only occur if Distributions under the Plan are and can be made.

6.5     **Distributions on Account of Claims and Interests**.  The Distribution Agent shall make distributions to Creditors and Interest Holders as more particularly described below:

6.5.1     Distribution Agent.  The Reorganized Debtor shall be, and shall serve as, the "Distribution Agent" under the Plan; provided, however, that the Subchapter V Trustee shall be, and serve as, the Distribution Agent if (i) the Bankruptcy Court determines that the provisions of subchapter V of title 11 of the Code, including section 1194(a) or section 1190(2), mandate that the Subchapter V Trustee fulfill that role and function, or (ii) the Bankruptcy Court, for cause, orders that the Subchapter V Trustee shall be, and shall serve as, the Distribution Agent.

6.5.2     Establishment of the Distribution Account. To the extent that it has not already, the Distribution Agent shall establish an account at an FDIC or NCUA-insured financial institution into which the Distribution Agent shall, when required pursuant to the terms of this Plan, deposit funds to be paid or distributed pursuant to this Plan (the "Distribution Account").

6.5.3     Funding the Distribution Account.  Beginning no later than the Initial Distribution Date, the Debtor shall deliver to the Distribution Agent and deposit into the Distribution Account its projected monthly Disposable Income on a monthly basis, as calculated hereunder, to fund the Distribution Account.  The aggregate amount of funds deposited in or credited to the Distribution Account shall be no less than the amount of Total Distributions.

6.5.4     Distributions from the Distribution Account. On each Distribution Date (and/or on such earlier or more frequent dates as the Distribution Agent may elect, in its absolute discretion), the Distribution Agent shall pay (or, if applicable, reserve) all Cash on deposit in the Distribution Account (less only such amount as the applicable financial institution may require as a minimum balance) according to the priorities described in section 6.6. The total distributions from the Distribution Account over the course of the entire Plan Period shall be referred to herein as the "Total Distributions."

6.6     **Priorities in Distribution from the Distribution Account**. Notwithstanding anything else in this Plan to the contrary, Cash deposited in the Distribution Account shall be distributed (or, if applicable, reserved) according to the following priorities in distribution until the full Plan Value has been paid or until five years has elapsed, whichever is sooner:

6.6.1     Reserve for Anticipated Income Taxes – first, set aside in reserve for potential payment of income taxes that the Reorganized Debtor anticipates or estimates to be due or coming due, including without limitation, income taxes arising from a gain or sale, recapture of depreciation, or otherwise, if any;

*ACTIVE 692584207v3*

6.6.2   <u>Reserve for Disputed Liens</u> – second, in the event a Lien or encumbrance is disputed either formally or informally by the Reorganized Debtor but the Reorganized Debtor's objection or challenge to the Lien or Claim has not yet been sustained or resolved, set aside in reserve for payment of Disputed Liens upon the Cash as the proceeds of Collateral;

6.6.3   <u>Payment of Administrative Expense Claims [507(a)(2)]</u> – third, in payment of Allowed Administrative Expenses, including payment of the Subchapter V Trustee's fees and expenses, and compensation to the attorneys and other Professionals of the Debtor;

6.6.4   <u>Reserve for Anticipated Administrative Expenses [507(a)(2)]</u> – fourth, a reserve for payment of the Reorganized Debtor's and Distribution Agent's administrative expenses (including the post-Effective Date fees and expenses of Professionals of the Reorganized Debtor and Distribution Agent), as determined by the Distribution Agent in its sole and absolute discretion;

6.6.5   <u>Payment of Priority Claims [507(a)(3) through (a)(7)]</u> – fifth, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(3) through (a)(7) of the Bankruptcy Code in order of the priority prescribed in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

6.6.6   <u>Priority Tax Claims [507(a)(8)]</u> – sixth, to pay the annual installment payments due to the holders of Priority Tax Claims entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code, as described in section 3.3 of this Plan;

6.6.7   <u>Payment of Priority Claims [507(a)(9) through (a)(10)]</u> – seventh, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(9) through (a)(10) of the Bankruptcy Code in order of the priority prescribed in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

6.6.8   <u>Payment of Class 2 General Unsecured Claims</u> – eighth, after the foregoing amounts are paid or reserved, payment pro rata of Allowed Class 2 General Unsecured Claims, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

6.6.9   <u>Payment of Class 5 Subordinated Claims</u> – ninth, after the foregoing amounts are paid or reserved, payment pro rata of Allowed Class 5 Subordinated Claims, with a pro rata reserve for any Disputed Claims, that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or served for) in full;

*ACTIVE 692584207v3*

6.6.10  <u>Remainder Distributed to Owners</u> – after the foregoing amounts are paid or reserved in full, any remaining Cash shall be distributed to the holders of Class 6 Equity Interests.

6.7  **<u>Employment and Compensation of Professionals After the Effective Date</u>**.  The Reorganized Debtor may employ attorneys, accountants, or other professionals as it may deem appropriate and pay such professionals' reasonable fees and expenses.  Professionals employed by the Reorganized Debtor after the Effective Date shall not be subject to Bankruptcy Court approval, their compensation shall not be subject to Bankruptcy Court approval, and their employment shall not be subject to the disinterestedness requirements of the Bankruptcy Code.

# ARTICLE 7
# IMPLEMENTATION OF THE PLAN

7.1  **<u>Method of Distributions Under the Plan.</u>**

7.1.1  <u>In General</u>.  Subject to Bankruptcy Rule 9010, all distributions under the Plan to be made by the Distribution Agent to the holder of each Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules as of the Effective Date, unless the Distribution Agent has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules.  The Distribution Agent shall have no obligation to locate holders whose distributions or notices are properly mailed but returned.

7.1.2  <u>Form of Distributions</u>.  Any payment of Cash made by the Distribution Agent pursuant to the Plan shall be made by regular check; provided, however, that after the occurrence of the Effective Date, the Distribution Agent is not obligated to make any Quarterly Distribution under the Plan unless the payment exceeds one hundred dollars ($100); provided, further, that Cash equal to 100% of the Distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was less than or equal to one hundred dollars ($100) shall be maintained in a reserve (the "<u>Small Payment Reserve</u>") for the benefit of such holder until an aggregate of at least one hundred dollars is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled. On the Final Distribution Date, the Debtor shall pay all amounts in the Small Payment Reserve owing to creditors, even if less than one hundred ($100).

7.1.3  <u>Distributions to be on Business Days</u>.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

7.1.4  <u>Withholding Taxes on Distributions</u>.  The Distribution Agent shall withhold from any Cash or property distributed under the Plan such amounts as the Debtor is obligated under non-bankruptcy law to withhold and transmit to taxing authorities.

7.2     **Objections to Disputed Claims**.  Any objections to Claims against the Estate may be prosecuted by the Debtor, the Reorganized Debtor, the Subchapter V Trustee, the Distribution Agent, or any other party in interest. Except as otherwise provided by order of the Bankruptcy Court, the Debtor or any other party in interest may file an objection to any Claim until 180 days after the Effective Date. Upon motion filed within such one hundred eighty (180) days, the Bankruptcy Court may extend the period within which to object to a Claim for a reasonable period of time, not to exceed an additional one hundred eighty (180) days. Any Claim to which no timely objection has been filed shall be deemed an Allowed Claim.

7.3     **Estimation of Claims**.  The Reorganized Debtor or the Subchapter V Trustee may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim.

7.4     **Determination of Tax Liability**. To the fullest extent permitted under section 505 of the Bankruptcy Code, the Reorganized Debtor or the Subchapter V Trustee may, at any time, request that the Bankruptcy Court determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax.

7.5     **No Distributions to Holders of Disallowed Claims**. Any and all Claims which are not Allowed, as specified herein, shall be Disallowed. Claims which are Disallowed (or not Allowed) shall be forever barred as against the Debtor, and shall receive no payments or Distribution under this Plan; provided, however, that any Claim which is a Disputed Claim solely by reason of an objection or other legal challenge that is pending and unresolved shall be treated as a Disputed Claim, and may receive payments or Distributions to the extent it later becomes Allowed, in whole in part, upon resolution of such objection or challenge.

7.6     **Late-Filed Claims Forever Barred**.  All Claims arising from proofs of claim filed after the Bar Date automatically shall be disallowed without the need for the Debtor or any other party-in-interest to file an objection, and without any further order of the Court. No Claim that is late-filed (*i.e.*, filed after the applicable Bar Date) shall be treated or paid as an Allowed Claim under this Plan unless the tardiness is excused and the late-filing of such Claim specifically is permitted pursuant to a Final Order entered prior to the Effective Date.  Rather, any such "late" Claim automatically and without further notice or opportunity for hearing shall be disallowed under this Plan. Notwithstanding the foregoing, a claim filed after the applicable Bar Date may be treated as an Allowed Claim only if, prior to the Effective Date and after notice and an opportunity for hearing, the Court has entered an order expressly allowing the Claim and/or permitting the holder of the Claim to file a late-filed proof of claim.

7.7     **Reversion of Unclaimed Checks**. The amount of any checks issued for distributions under the Plan that remain uncashed for a period of ninety days after the date of such distribution shall revert and be vested in the Estate free and clear of any claim or interest of the payee of the uncashed check.

7.8     **Cash Payments and Time Bar**.  Cash distributions made by the Distribution Agent shall be by checks drawn on a domestic bank, and promptly mailed, postage prepaid.  Any check

25

issued to pay an Allowed Claim will be null and void if such check is not negotiated within ninety (90) days of its issuance. All Claims that the Distribution Agent attempts to pay with a check that becomes void hereunder will be barred and Disallowed, and all rights to such distribution by such Creditor shall be forfeited. The Distribution Agent will retain the funds resulting from such void checks for the benefit of other Creditors (or, if applicable, Owners) and will distribute such funds to such other Creditors (or, if applicable, Owners) under the Plan.

7.9 **Retention and Preservation of Claim Objections and Causes of Action**. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, upon entry of the Confirmation Order, the Debtor and the Reorganized Debtor's rights to object to all Claims and Interests asserted against the Estate and all of the Debtor's or Estate's Causes of Action shall vest in the Estate, and shall be subject to the exclusive power of the Distribution Agent to investigate, prosecute, settle, and/or litigate to a final adjudication (including, if necessary, all appeals of any adjudication). These vested rights and Causes of Action shall include, without limitation: (1) the Debtor's Causes of Action asserted in any adversary proceeding, U.S. District Court litigation, state court proceeding, or any other proceeding which is pending as of the Confirmation Date; (2) all Claims and Causes of Action disclosed in the Schedules which are incorporated herein by reference; (3) any Claims and Causes of Action contained in any contested matter or objection to Claim pending on the Confirmation Date; and (4) any and all other Claims and Causes of Action that the Debtor holds pre-confirmation, including, but not limited to, Claims for unpaid accounts receivable. Notwithstanding anything else in the Plan to the contrary, no provision in this Plan is intended or shall be construed to preclude or otherwise bar the Subchapter V Trustee and/or Distribution Agent from pursuing any claims arising under chapter 5 of the Bankruptcy Code or under other applicable law.  Among other things, no Person sued pursuant to sections 547, 548, 549, 550, 553 of the Bankruptcy Code or otherwise may argue that confirmation of this Plan precludes such claim on grounds of res judicata, issue preclusion or otherwise.

7.10 **No Release or Waiver**.  Unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Debtor and the Subchapter V Trustee expressly reserve such Claim or Cause of Action for later adjudication (including without limitation, claims and Causes of Action not specifically identified or which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts and circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Causes of Action have been expressly released in the Plan or any other Final Order of the Bankruptcy Court.

## ARTICLE 8
## VOTING ON THE PLAN

8.1 **Voting of Claims**.  Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such vote on a duly executed and delivered ballot. This ballot shall be

provided in accordance with the direction of the Bankruptcy Court, which shall establish certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

8.2 **Nonconsensual Confirmation**. If any impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, or if any impaired class is deemed to have rejected the Plan, the Debtor reserves the right (i) to confirm the Plan under sections 1191(b) and/or 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan in accordance with section 12 hereof to the extent necessary to obtain entry of a Confirmation Order.

## ARTICLE 9
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1 **Assumption of Executory Contracts and Leases**. The following Executory Contracts or unexpired leases (collectively, the "Assumed Contracts") are assumed as of the date of the entry of the Confirmation Order pursuant to Section 365 of the Bankruptcy Code in accordance with their terms, unless (i) alternative terms are agreed to by the non-Debtor party or parties to such Assumed Contracts, or (ii) alternative terms are specified in the Plan:[17]

| Lessor/Counterparty | Description of Lease/Contract | Cure Amount |
|---|---|---|
| SBA | Loan Agreement | $0.00 |
| Hewlett-Packard | Master Lease and Financing Agreement | $24,749.11 |

9.2 **Rejection of Executory Contracts and Unexpired Leases**. All Executory Contracts and unexpired leases that have not been either assumed and assigned or rejected prior to the Effective Date are rejected by the Debtor (the "Rejected Contracts"), and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

9.3 **Rejection Damage Claims**. If the rejection of an executory contract or unexpired lease by the Debtor pursuant to section 9.2 hereof results in a claim for damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, or its respective properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor and upon the Subchapter V Trustee on or before forty-five (45) days following the Confirmation Date. Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim timely are filed will be treated as General Unsecured Claims subject to the provisions of the Plan. The Debtor shall have the right to object to any such rejection damage Claims filed in accordance with this section.

---

[17] The Debtor also entered into the New Lease during the pendency of this Case. Thus, to the extent required, the Debtor is also assuming the New Lease to continue operating post-confirmation.

27

*ACTIVE 692584207v3*

9.4     **Cure Amounts for Assumed Contracts**. To the extent that there are cure amounts owing on any of the Assumed Contracts, such cure amounts shall be paid within 30 days of the Effective Date.

9.5     **Post-Petition Agreements Unaffected by Plan**.  Except as otherwise expressly provided herein, nothing contained in the Plan shall alter, amend or supersede any agreements or contracts entered into by the Debtor after the Petition Date that are otherwise valid, effective and enforceable against the Debtor as of the Confirmation Date. The Reorganized Debtor shall be deemed to be substituted for the Debtor in such contract or agreement, as applicable, and the Reorganized Debtor shall have all right, title and interest of the Debtor under such contract or agreement as if the Reorganized Debtor had been the original contracting party thereunder.

## ARTICLE 10
## CONDITIONS PRECEDENT TO EFFECTIVE DATE

10.1     **Conditions Precedent to Effectiveness**.  The Plan shall not become effective, and the Effective Date shall not occur, unless and until the following conditions shall have been satisfied or, in the alternative, waived by the Debtor:

10.1.1  the Confirmation Order, in form and substance reasonably acceptable to the Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

10.1.2  all actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

10.1.3  the Court shall have entered orders (or there shall be agreements satisfactory to the Debtor) concerning Claims, any Liens asserted by holders of Claims, and any interests in the Debtor (which may be orders included within the Confirmation Order) that, in the sole discretion of the Debtor, are required for the feasibility and implementation of the Plan; and

10.1.4  the Estate shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date.

10.2     **Failure of Conditions Precedent**. Notwithstanding anything in this Plan to the contrary, the conditions set forth in section 10.1 above must be satisfied or waived on or before April 1, 2024.  In the event that the conditions set forth in section 10.1 above are not satisfied on or before said date, then the Plan shall be deemed revoked and withdrawn, the Confirmation Order shall be deemed vacated, and section 12.1 of the Plan shall apply.

10.3     **Waiver of Conditions**.  The Debtor may waive one or more of the conditions precedent to the effectiveness of the Plan set forth in section 10.1 above, except that the Debtor may not waive the condition of entry of the Confirmation Order and that the Estate will have sufficient Cash to meet all payment and funding obligations under the Plan on the Effective Date.

28

## ARTICLE 11
## RETENTION OF JURISDICTION; CASE CLOSURE; RELEASE AND TERMINATION OF SERVICE OF SUBCHAPTER V TRUSTEE

11.1    **Retention of Jurisdiction**.  After the Effective Date, the Bankruptcy Court shall have original jurisdiction of all matters arising in, arising under or related to the Bankruptcy Case or Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including but not limited to the following specific matters:

11.1.1 Executory Contracts.  The Court shall retain jurisdiction (a) to hear and determine any and all pending applications for the rejection or assumption of executory contracts and unexpired leases, and (b) to hear and determine any and all Claims resulting from the rejection of any executory contract or unexpired lease, and any objections to such Claims.

11.1.2 Compensation.  The Court shall retain jurisdiction to hear and determine all applications by the Subchapter V Trustee, Professionals, and others for compensation and reimbursement of expenses.

11.1.3 Distributions.   The Court shall retain jurisdiction to ensure that the distributions to holders of Claims are accomplished as provided herein.

11.1.4 Litigation.  The Court shall retain jurisdiction to hear and determine any and all adversary proceedings, applications, contested matters and other litigated matters pending on the Confirmation Date or filed thereafter, including any and all claims that might be filed by the Subchapter V Trustee and/or Distribution Agent under chapter 5 of the Code.

11.1.5 Determine Claims Arising Post-Confirmation. The Court shall retain jurisdiction to determine any Claim or liability to a Governmental Unit which may be asserted as a result of the transactions contemplated herein.

11.1.6 Determination of Claims Relating to Effective Date Transactions. The Court shall retain jurisdiction to hear and decide any Claims or Litigation that arise under, arise from or relate to the transactions contemplated and approved under this Plan.  To the extent that any litigation contemplated by this section is filed in any state or federal court other than the Bankruptcy Court, the Debtor and any other party-in-interest (a) may remove the action as permitted by 28 U.S.C. 1452, and (b) may seek to transfer venue of such action to the Bankruptcy Court in the District of Colorado.

11.1.7 Tax Claims. The Court shall retain jurisdiction to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

11.1.8 Objections to Claims. The Court shall retain jurisdiction (i) to hear and determine any objections to Claims filed both before and after the Confirmation Date, (ii) to allow or disallow any Claim in whole or in part, (iii) to decide any controversies as to the classification of any Claims and/or (iv) to estimate any Disputed Claim.

29

11.1.9 <u>Stay or Reversal of Confirmation</u>.  The Court shall retain jurisdiction to enter and implement such orders as may be appropriate in the event Confirmation of the Plan is for any reason stayed, reversed, revoked, modified or vacated.

11.1.10    <u>Plan Modification</u>. The Court shall retain jurisdiction to hear applications, if any, to modify the Plan in accordance with § 1127 of the Bankruptcy Code. After Confirmation of the Plan, the Reorganized Debtor, Subchapter V Trustee, or Distribution Agent may also, so long as it does not adversely affect the interests of Creditors, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Order of Confirmation, in such manner as may be necessary to carry out the purpose and effect of the Plan.

11.1.11    <u>Plan Disputes</u>. The Court shall retain jurisdiction to hear and determine disputes arising in connection with the Plan or its implementation, including without limitation disputes relating to the execution of agreements, documents or instruments required to be executed pursuant to the terms of the Plan, or arising under or relating to the interpretation of agreements, documents or instruments executed in connection with the Plan.

11.1.12    <u>Plan Implementation</u>. The Court shall retain jurisdiction to construe and to take any action to enforce the Plan and issue such orders as may be necessary for the implementation, execution and consummation of the Plan.

11.1.13    <u>Enforce Plan Injunction</u>. The Court shall retain jurisdiction to enforce the releases, exculpatory provisions and/or injunctions described or provided under this Plan including, without limitation, those described or summarized under Article 13. Among other things, the Court shall retain jurisdiction to enter temporary restraining orders, preliminary injunctions, permanent injunctions, contempt sanctions, and other appropriate orders and remedies, including to stay and prevent litigation filed or pending before another court or tribunal.

11.1.14    <u>Plan Corrections</u>. The Court shall retain jurisdiction to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose or intent of the Plan.

11.1.15    <u>Creditors' Disputes</u>. The Court shall retain jurisdiction to take any action to resolve any disputes arising out of or relating to any Claim, to hear and determine other issues presented by or arising under the Plan, and to take any action to resolve any disputes of Creditors with respect to their Claims.

11.1.16    <u>Other Matters</u>. The Court shall retain jurisdiction to determine such other matters and for such other purposes as may be provided in the Order of Confirmation or that are not inconsistent with chapter 11 of the Bankruptcy Code.

11.2    **Exclusive Jurisdiction**.  The retention of jurisdiction provided for in this Plan shall be exclusive with respect to all matters set forth in section 11.1 hereof so as to preserve for the

30

Reorganized Debtor the benefits of the Plan, subject to the Court's power under section 305 of the Bankruptcy Code or 28 U.S.C. § 1334(c) to abstain as to all or part of any proceeding.

11.3   **Effectuating Orders**. The Bankruptcy Court shall enter all judgments, partial judgments, and Orders necessary to effectuate or enforce the Plan, any term therein or as reasonably requested by any party intended as a direct beneficiary of a material provision of the Plan. Such Orders and decrees may include a permanent injunction effectuating all actions, releases, assignments, transfers and waivers required by the Plan.

11.4   **Discharge**. If the Plan is confirmed under § 1191(a), on the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code. If the Plan is confirmed under § 1191(b), as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of this title and provided for in this Plan, except any debt— (1) on which the last payment is due after the first 3 years of the plan, or such other time not to exceed 5 years fixed by the court; or (2) if applicable, of the kind specified in section 523(a) of this title.

11.5   **Closure of the Case.**

11.5.1   Administratively Closing the Bankruptcy Case. Pursuant to section 1192 of the Bankruptcy Code, to the extent the Plan is confirmed under section 1191(b) of the Bankruptcy Code, the discharge of the Debtor may not be granted unless and until the Debtor has completed all payments due within the first 3 years of the plan, or such longer period not to exceed 5 years. Nevertheless, when the Debtor, with the support of the Subchapter V Trustee, determines that the Plan is substantially consummated that that there is no continued need for the administrative oversight of the Court, the Debtor shall file an appropriate motion in accordance with Fed. R. Bankr. P. 3022. The Court's approval of such a motion shall administratively close the Case.

11.5.2   Substantial Consummation. This Plan contemplates the collection and distribution of the Disposable Income of the Reorganized Debtor to holders of Allowed Claims over a period of five (5) years or until the Plan Value has been met, if sooner but in no event shall the Plan be less than three years unless all creditors are paid in full. Once the Distribution Agent reasonably believes that the Total Distributions made under the Plan are equal to the Plan Value, the Distribution Agent may file notice of substantial consummation pursuant to section 1183(c)(2) of the Code.

11.5.3   Reopening Case. At any time, the Reorganized Debtor and/or the Subchapter V Trustee (or, only upon a showing of substantial cause, another party in interest) may obtain entry of an order reopening the Bankruptcy Case to obtain any relief or order from the Bankruptcy Court consistent with section 11.1 and section 350 of the Cdoe. After substantially consummating the Plan and/or satisfying the conditions precedent to entry of a discharge, the Debtor may obtain entry of an order reopening the Bankruptcy Case for the purpose of granting and entering the discharge. Although the

31

Debtor may seek to reopen the Case on an *ex parte* basis, the Debtor shall give notice of its motion or other request to the Subchapter V Trustee.

11.5.4 <u>Finally Closing the Bankruptcy Case</u>. Once a notice of substantial consummation has been filed, and after the Court has entered an order discharging the Subchapter V Trustee and the Debtor determines that there is no further need for administration of the Case by the Bankruptcy Court, the Case shall be closed pursuant to 11 U.S.C. § 350 upon (i) the filing of any final reports required under the Code, (ii) appropriate notice to parties-in-interest, and (iii) the entry of an appropriate final decree and/or Final Order by the Court closing the Case.

11.6 **Release of Subchapter V Trustee; Termination of Trustee Service**. The Subchapter V Trustee, the Reorganized Debtor and/or the United States Trustee may request entry of an order terminating the Subchapter V Trustee's service as trustee, and releasing and discharging the Subchapter V Trustee from further obligations as trustee, at such time that (i) the Plan has been substantially consummated, and (ii) continued involvement of, and supervision by, the Subchapter V Trustee is not required by the terms of the Plan or the Code.

# ARTICLE 12
## MODIFICATION OF THE PLAN

12.1 **Revocation or Withdrawal of the Plan**. The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Estate or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Estate.

12.2 **Amendments Prior to Confirmation**. Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code.

12.3 **Savings Clause; Reformation; Severability**. Subject to section 12.5 of this Plan and section 1127 of the Bankruptcy Code, if any provision of this Plan is found to be invalid or unenforceable for any reason, such provision shall be construed and/or reformulated by the Court in such a way as to make it valid and enforceable to the maximum extent permitted by the Bankruptcy Code and other applicable law, and the Plan shall be confirmed as so modified and reformed. Any provision of this Plan which the Court determines is prohibited or unenforceable under the Bankruptcy Code, Bankruptcy Rules, or other applicable law shall not affect or render invalid or unenforceable any other provisions of Plan. Specifically, to the extent a particular provision, term, or condition of this Plan would prevent confirmation, the Court (with the consent of the Debtor and the Subchapter V Trustee) may strike such provision and may confirm the Plan as modified, with such term, condition, or provision omitted, excluded, or otherwise modified.

12.4     **Amendments After Confirmation**. The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that (i) the Plan, as altered, amended or modified, satisfies the requirements of the Bankruptcy Code and (ii) the Bankruptcy Court approves such modifications after such notice, and under such circumstances, as the Court determines to be fair and equitable.

12.5     **Effect on Acceptance Requirements**.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if (i) such Person fails timely to object to the proposed alteration, amendment or modification, or (ii) in the event an objection is timely filed, the Court determines the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.  The Debtor may correct any defect or omission in this Plan and any exhibit hereto without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders.

12.6     **Effect of Modification**.  Every modification of the Plan will supersede all previous versions of the Plan when such modification becomes effective.  Previous superseded versions of the Plan will be deemed to be in the nature of a withdrawn or rejected settlement proposal and will be of no evidentiary or substantive effect for any purpose whatsoever.

**ARTICLE 13**
**STAYS, INJUNCTIONS, EXCULPATIONS, AND RELEASES**

**13.1     Continuation of Injunctions or Stays until Effective Date.  All injunctions or stays provided for in the Bankruptcy Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Further, unless the Plan provides otherwise, any injunctions or stays ordered by the Bankruptcy Court shall continue in effect through and after the Effective Date.**

**13.2     Injunction Relating to the Plan.  As of the Effective Date, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor or its Estate, on account of, or respecting any Claims, debts, rights, Causes of Action or liabilities discharged or treated pursuant to the Plan, except to the extent expressly permitted under the Plan.  Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present, future, or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Further, except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtor, or who have held, hold or may hold any debt or interest relating to the Debtor, are permanently enjoined, from and after the Effective Date, to the maximum extent permitted by law, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt or interest against Reorganized Debtor, or (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the immediate or any mediate transferee of any property distributed pursuant to the Plan or of any putative securities, based upon a claim that the transferor's receipt of such**

33

property constituted a fraudulent conveyance, preference, violation of bulk sales or other law, or based upon any other claim that receipt and or distribution of property by transfer pursuant to the Plan is wrongful, whether in law or equity.

**13.3**    **Broad Injunction**.  The intent of paragraph 13.2 is to provide the broadest possible injunction permitted by law and, to the extent permitted by law, to expand the scope of that injunction for the benefit of the Reorganized Debtor to the extent that, at any time after the Effective Date, the law is clarified or changed to permit such a broader injunction. The injunction in the Confirmation Order shall provide that, except as otherwise authorized by the Plan or the Confirmation Order, the holders of Claims shall be enjoined from commencing or continuing any such specified action or proceeding against Reorganized Debtor with respect to any Claim or property of the Estate, including Claims based in whole or in part on an allegation:  (i) that the Debtor breached any contract, with, or any duty or obligation to the Creditor; (ii) that the Debtor was the alter ego or instrumentality of another Person; (iii) that the Debtor made any preferential or fraudulent transfer or any other voidable transfer or payment to any Person; or (iv) that the Debtor is liable for any act or omission.  In addition, to the extent that 11 U.S.C. § 524(e) or other applicable law imposes a limit on the scope of the injunction against any holder of Claims, such holder shall be required to marshal such Claims and to exhaust all of the holder's legal and equitable remedies against all other Persons who are jointly or severally liable on such Claims before attempting to enforce such claims against Reorganized Debtor.

**13.4**    **Exculpation**.  Neither the Subchapter V Trustee, nor the Reorganized Debtor nor any of its attorneys, accountants or agents shall have or incur any liability to any Creditor for any act or omission in connection with or arising out of their administration of this Case, the Plan, or the property to be distributed under the Plan, except for gross negligence or willful misconduct, up to confirmation of the Plan.

**13.5**    **Release of Claims**.  Except as contemplated by the Plan, the rights afforded to holders of Claims in the Plan shall be in exchange for a complete release, satisfaction and discharge of all Claims against the Debtor.  Without limiting the foregoing, acceptance of distributions under the Plan shall be deemed irrevocably to release any and all claims of any type, kind or nature against the Debtor.  Persons deemed to have released claims pursuant to this paragraph shall be forever precluded from asserting against the Debtor or the Reorganized Debtor or their respective assets any Claim, including any Claim of the type released or deemed released herein.

13.6    **Setoffs**.  Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estate of any rights of setoff or recoupment that the Estate may have against any Person.

**ARTICLE 14**
**DEFAULT AND REMEDIES**

14.1    **Default of Plan; Notice Required**.  In the event of any material default of the provisions of this Plan, the Subchapter V Trustee, a creditor, or other party in interest aggrieved by such default may provide written notice to the Reorganized Debtor and to the Subchapter V

Trustee (a "Default Notice").  The Default Notice must describe with specificity the nature of the default alleged and the steps required of the Debtor (or, if applicable, the Subchapter V Trustee) to cure such default.

14.2    **Opportunity to Cure**. The Reorganized Debtor (or, if applicable, the Subchapter V Trustee) shall have thirty (30) days after receipt of a written Default Notice to cure such default. The aggrieved Person shall take no further action until at least thirty (30) days have passed and the Debtor (or, if applicable, the Subchapter V Trustee) has not cured or substantially complied with the Default Notice.  Even after the thirty (30) day period has expired, the Reorganized Debtor (or, if applicable, the Subchapter V Trustee) may cure a default at any time, even after an application or motion has been filed by an aggrieved party.

14.3    **Remedies in the Event of Default.**

14.3.1  Application to Compel Compliance.  If a material default has occurred and the Reorganized Debtor (or, if applicable, the Subchapter V Trustee) does not cure such default within thirty (30) days after receipt of a Default Notice, the Subchapter V Trustee, a creditor or party in interest aggrieved by such a material default may apply to the Bankruptcy Court to compel compliance with the applicable provisions of the Plan.  Such application must be accompanied by an affidavit or sworn declaration specifying the default, the applicant's compliance with the notice requirements, and the Reorganized Debtor's (or, if applicable, the Subchapter V Trustee's) failure to cure the same as required herein.

14.3.2  Service of Application.  The application must be served upon (a) the Debtor, (b) the Debtor's counsel, (c) the United State Trustee, and (d) the Subchapter V Trustee.

14.3.3  Determination and Relief by Bankruptcy Court. The Bankruptcy Court, after notice and a hearing, shall determine whether a default occurred, whether it was and is material, and if a material default occurred, whether such default has been cured. If the Court determines that a material default has occurred and has not been cured, the Court shall determine an appropriate remedy in light of the applicable default, including an order compelling compliance with the pertinent provisions of the Plan. Neither this section nor any other provision of this Plan, however, shall be construed to provide a Creditor or other Person with the right to recover attorneys' fees from the Debtor, in the event of a material default or otherwise.

## ARTICLE 15
## MISCELLANEOUS

15.1    **Severability**.  If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, upon the request of the Debtor, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall

35

in no way be affected, impaired or invalidated by such holding, alternation or interpretation.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

15.2    **Binding Effect**.  The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.  Pursuant to 11 U.S.C. § 1141(a), the provisions of this Plan bind the Reorganized Debtor, the Subchapter V Trustee, any Person acquiring property or receiving distributions under the Plan, the counter-parties to any executory contracts or unexpired leases with the Debtor, any and all Creditors or Equity Interest holders of the Debtor, and any and all other Persons referred to or contemplated in this Plan, whether or not the Lien, Claim, Equity Interest or other right of such Person is impaired under the Plan and whether or not such Person has accepted the Plan.  To the extent the Bankruptcy Case is converted to chapter 7 or the Reorganized Debtor files a future bankruptcy case, the Claims, Liens, Equity Interests and rights of Creditors and other Persons, as determined and modified by this Plan, shall be final and shall determine the allowed amounts of such claims and interests in the subsequent chapter 7 case or future bankruptcy case.

15.3    **Further Assurances**.  Each Person receiving any payment or other benefit under the Plan, including any holder of any Allowed Claim or Equity Interest, shall execute such documents and shall take such other actions (or omit to take actions) as may be necessary or reasonable in order to effectuate the Plan.

15.4    **Notices**.  Notices required to be served by the Bankruptcy Code or the Bankruptcy Rules shall be delivered in the manner required by the Code and Rules, to all persons required by be served by the Code and Rules.  In addition to the foregoing, all notices, requests and demands to or upon the Debtor or the Subchapter V Trustee shall only be effective if in writing and delivered, via e-mail, to (a) to the Debtor, (b) the Debtor's counsel, and (c) the Subchapter V Trustee, addressed as follows:

If to the Debtor:

Event Promotion Supply, Inc.
Attn:  Jean-Bernard Doublet
jbdoublet@eps-doublet.com

With a copy to:

Greenberg Traurig, LLP
Attn:  Annette Jarvis and Carson Heninger
222 South Main Street, Suite 1730
Salt Lake City, Utah 84101
jarvisa@gtlaw.com
carson.heninger@gtlaw.com

*ACTIVE 692584207v3*

<u>If to the Subchapter V Trustee:</u>

SL Biggs
Attn:  Mark Dennis
2000 S. Colorado Blvd., Tower 2
Ste 200
Denver, CO 80222
mdennis@slbiggs.com

Notice shall be deemed to have been duly given or made only when actually delivered to, or received by, each and all of (a) the Debtor, (b) the Debtor's attorneys, and (c) the Subchapter V Trustee.

15.5    **Governing Law**.  Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by the laws of the State of Colorado.

15.6    **Filling of Additional Documents**.  On or before substantial consummation of the Plan, the Debtor shall file with the Bankruptcy Court any agreements or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions herein.

DATED this 24th of January, 2024

EVENT PROMOTION SUPPLY, INC.

By:  */s/ Jean-Bernard Doublet* _____
        Jean-Bernard Doublet
        *President and CEO*


GREENBERG TRAURIG, LLP

*/s/ Carson Heninger* _____
Annette W. Jarvis
Carson Heninger
Marc J. Musyl

*Attorneys for the Debtor*

**<u>Exhibit A</u>**

**(Plan Projections)**

| In USD - as of 31/12 | 2023 | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 | 2024 | Q1 2025 | Q2 2025 | Q3 2025 | Q4 2025 | 2025 | Q1 2026 | Q2 2026 | Q3 2026 | Q4 2026 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 3 455 455 | 1 048 536 | 843 621 | 1 007 813 | 1 100 030 | 4 000 000 | 1 179 603 | 949 073 | 1 133 790 | 1 237 534 | 4 500 000 | 1 232 030 | 991 254 | 1 184 180 | 1 292 535 | 4 700 000 |
| Sales growth | - | | | | | 16% | | | | | 13% | | | | | 4% |
| Operating expense | (4 861 038) | (1 087 617) | (963 029) | (1 050 838) | (1 100 156) | (4 201 640) | (1 159 093) | (1 035 806) | (1 134 592) | (1 190 074) | (4 519 565) | (1 206 065) | (1 077 299) | (1 180 475) | (1 238 423) | (4 702 261) |
| PPP | 171 931 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| EBIT | (1 233 651) | (39 081) | (119 408) | (43 025) | (125) | (201 640) | 20 511 | (86 733) | (802) | 47 460 | (19 565) | 25 965 | (86 045) | 3 705 | 54 113 | (2 261) |
| D&A | 146 174 | 35 696 | 35 696 | 35 696 | 35 696 | 142 782 | 35 696 | 35 696 | 35 696 | 35 696 | 142 782 | 50 696 | 50 696 | 50 696 | 50 696 | 202 782 |
| EBITDA | (1 087 477) | (3 385) | (83 713) | (7 330) | 35 570 | (58 858) | 56 206 | (51 038) | 34 893 | 83 156 | 123 217 | 76 661 | (35 349) | 54 401 | 104 808 | 200 521 |
| Interests | (160 246) | (6 479) | (6 479) | (6 479) | (6 479) | (25 918) | (6 479) | (6 479) | (6 479) | (6 479) | (25 918) | (6 479) | (6 479) | (6 479) | (6 479) | (25 918) |
| Corporate tax | - | - | - | - | - | | - | - | - | - | | - | - | - | - | |
| Exceptional (debt waivers) | 1 820 180 | - | - | - | - | | - | - | - | - | | - | - | - | - | |
| Net result | 426 282 | (45 560) | (125 888) | (49 505) | 6 605 | (227 558) | 14 031 | (93 213) | (7 282) | 40 981 | (45 483) | 19 486 | (92 524) | (2 774) | 47 633 | (28 179) |
| Cashflow from operations | | (12 242) | (88 623) | (23 658) | 29 762 | (94 761) | 53 821 | (55 752) | 17 334 | 77 432 | +92 836 | 77 335 | (39 985) | 36 349 | 99 118 | +172 818 |
| Cashflow from investment (1) | | (62 500) | (12 500) | (12 500) | (12 500) | (100 000) | (12 500) | (12 500) | (12 500) | (62 500) | (100 000) | (12 500) | (12 500) | (12 500) | (62 500) | (100 000) |
| Cashflow from financing (2) | | 45 000 | 30 006 | 22 509 | 22 509 | +120 023 | 22 509 | 22 509 | 22 509 | 22 509 | +90 035 | 22 509 | 22 509 | 22 509 | 22 509 | +90 035 |
| Cashflow before distribution | | (29 742) | (71 117) | (13 649) | +39 771 | (74 737) | +63 830 | (45 743) | +27 343 | +37 441 | +82 871 | +87 344 | (29 976) | +46 358 | +59 127 | +162 853 |
| End of period cash position before distribution | 213 775 | 184 033 | 87 653 | 71 811 | 109 389 | | 148 454 | 100 518 | 125 668 | 160 915 | | 173 494 | 141 325 | 185 490 | 242 424 | |
| Distribution | | (25 263) | (2 193) | (2 193) | (24 765) | (54 414) | (2 193) | (2 193) | (2 193) | (74 765) | (81 344) | (2 193) | (2 193) | (2 193) | (124 765) | (131 344) |
| Administration | | | | | | | | | | (50 000) | (50 000) | | | | (100 000) | (100 000) |
| LIT | | | | | | | | | | (50 000) | (50 000) | | | | (100 000) | (100 000) |
| Secured | | (25 263) | (2 193) | (2 193) | (2 193) | (31 842) | (2 193) | (2 193) | (2 193) | (8 772) | (8 772) | (2 193) | (2 193) | (2 193) | (2 193) | (8 772) |
| HP | | (22 479) | - | - | - | (22 479) | | | | | | | | | | |
| SBA Loan | | (2 193) | (2 193) | (2 193) | (2 193) | (8 772) | (2 193) | (2 193) | (2 193) | (2 193) | (8 772) | (2 193) | (2 193) | (2 193) | (2 193) | (8 772) |
| Ally | | (591) | - | - | - | (591) | | | | | | | | | | |
| Priority | | - | - | - | (22 572) | (22 572) | - | - | - | (22 572) | (22 572) | - | - | - | (22 572) | (22 572) |
| Adams County Property Tax | | - | - | - | (21 894) | (21 894) | - | - | - | (21 894) | (21 894) | - | - | - | (21 894) | (21 894) |
| California Franchise Board | | - | - | - | (678) | (678) | - | - | - | (678) | (678) | - | - | - | (678) | (678) |
| General unsecured | | - | - | - | - | | - | - | - | - | | - | - | - | - | |
| End of period cash position after distribution | 213 775 | 158 770 | 85 460 | 69 618 | 84 624 | 84 624 | 146 261 | 98 325 | 123 475 | 86 150 | 86 150 | 171 301 | 139 132 | 183 297 | 117 659 | 117 659 |

| In USD - as of 31/12 | Q1 2027 | Q2 2027 | Q3 2027 | Q4 2027 | 2027 | Q1 2028 | Q2 2028 | Q3 2028 | Q4 2028 | 2028 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 1 284 457 | 1 033 435 | 1 234 571 | 1 347 537 | 4 900 000 | 1 310 670 | 1 054 526 | 1 259 766 | 1 375 038 | 5 000 000 | |
| Sales growth | | | | | 4% | | | | | 2% | |
| Operating expense | (1 238 194) | (1 103 949) | (1 211 515) | (1 271 929) | (4 825 588) | (1 256 468) | (1 119 484) | (1 229 245) | (1 290 892) | (4 896 089) | |
| *PPP* | - | - | - | - | - | - | - | - | - | - | |
| EBIT | 46 263 | (70 514) | 23 056 | 75 608 | 74 412 | 54 202 | (64 958) | 30 521 | 84 146 | 103 911 | |
| D&A | 50 696 | 50 696 | 50 696 | 50 696 | 202 782 | 50 696 | 50 696 | 50 696 | 50 696 | 202 782 | |
| EBITDA | 96 958 | (19 818) | 73 751 | 126 303 | 277 194 | 104 897 | (14 262) | 81 217 | 134 841 | 306 693 | |
| Interests | (6 479) | (6 479) | (6 479) | (6 479) | (25 918) | (6 479) | (6 479) | (6 479) | (6 479) | (25 918) | |
| Corporate tax | - | - | - | - | - | - | - | - | - | - | |
| Exceptional (debt waivers) | - | - | - | - | - | - | - | - | - | - | |
| Net result | 39 783 | (76 993) | 16 576 | 69 128 | 48 494 | 47 722 | (71 437) | 24 042 | 77 666 | 77 993 | |
| | | | | | | | | | | | |
| Cashflow from operations | 98 013 | (24 375) | 55 207 | 120 647 | +249 492 | 107 035 | (18 780) | 62 427 | 129 201 | +279 883 | |
| Cashflow from investment (1) | (25 000) | (25 000) | (25 000) | (25 000) | (150 000) | (25 000) | (25 000) | (25 000) | (75 000) | (150 000) | |
| Cashflow from financing (2) | 22 509 | 22 509 | 22 509 | 22 509 | +90 035 | 22 509 | 22 509 | 22 509 | 22 509 | +90 035 | |
| **Cashflow before distribution** | +95 522 | (26 866) | +52 716 | +68 155 | +189 527 | +104 544 | (21 271) | +59 935 | +76 710 | +219 918 | |
| | | | | | | | | | | | |
| *End of period cash position before distribution* | *213 180* | *173 134* | *223 657* | *268 155* | | *247 934* | *178 729* | *236 471* | *276 184* | | |
| **Distribution** | (13 180) | (2 193) | (23 657) | (124 765) | (163 795) | (47 934) | (2 193) | (36 997) | (77 382) | (164 506) | (595 404) |
| Administration | - | - | - | (100 000) | (100 000) | - | - | - | (52 617) | (52 617) | (302 617) (3) |
| *LIT* | | | | (100 000) | (100 000) | | | | (52 617) | (52 617) | (302 617) |
| Secured | (2 193) | (2 193) | (2 193) | (2 193) | (8 772) | (2 193) | (2 193) | (2 193) | (2 193) | (8 772) | (66 930) |
| *HP* | - | - | - | - | - | - | - | - | - | - | (22 479) |
| *SBA Loan* | (2 193) | (2 193) | (2 193) | (2 193) | (8 772) | (2 193) | (2 193) | (2 193) | (2 193) | (8 772) | (43 860) |
| *Ally* | - | - | - | - | - | - | - | - | - | - | (591) |
| Priority | - | - | - | (22 572) | (22 572) | - | - | - | (22 572) | (22 572) | (112 862) |
| *Adams County Property Tax* | - | - | - | (21 894) | (21 894) | - | - | - | (21 894) | (21 894) | (109 470) |
| *California Franchise Board* | - | - | - | (678) | (678) | - | - | - | (678) | (678) | (3 392) |
| General unsecured | (10 987) | - | (21 464) | - | (32 451) | (45 741) | - | (34 804) | - | (80 545) | (112 996) |
| *End of period cash position after distribution* | *200 000* | *170 941* | *200 000* | *143 390* | *143 390* | *200 000* | *176 536* | *199 474* | *198 802* | *198 802* | |

(1) The category "cash flow from investment" is money set aside for anticipated expenses necessary to cover capital expenditures, such as the purchase of new printers, equipment, etc. In the Debtor's business judgment, this investment is necessary for the Debtor's continued success.

(2) The category "cash flow from financing" is indirect financing from the Parent for services that the Parent provides to the Debtor. Specifically, the Parent provides "back-office support" for the Debtor, but the Parent is not requiring the Debtor to pay for these services during the pendency of the Plan. Thus, this amount is to remain unpaid during the duration of the Plan and is recognized as "financing".

(3) Debtor and the Landlord are contesting the amount of property taxes owed. If they are successful and the taxes are reduced, this will speed up the payment to general unsecured creditors under the Plan and allow the Plan to be completed sooner.